FILED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

11 MAY 23  AM 10: 21

STEPHEN R. LUDWIG, CLERK
U.S. DISTRICT COURT
FOR THE DISTRICT

| | | |
|---|---|---|
| KAREN TORRES | ) | CAUSE NO. 3:11CV-209 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE UNIVERSITY OF NOTRE DAME | ) | |
| DU LAC, PHILLIP JOHNSON, | ) | |
| Individually and in His Official | ) | |
| Capacity as Director of the Notre Dame | ) | |
| Security Police, FRANCES SHAVERS | ) | |
| Individually and in her Official | ) | |
| Capacity as Chief of Staff to the | ) | |
| President of the University, NOTRE | ) | |
| DAME SECURITY POLICE OFFICERS | ) | |
| JOHN DOES 1 THROUGH 4, | ) | |
| Individually and in their capacity as | ) | |
| NOTRE DAME SECURITY POLICE, | ) | |
| NOTRE DAME 2009 SECURITY AND | ) | |
| COMMENCEMENT COMMITTEE | ) | |
| MEMBERS JANE AND JOHN DOES | ) | |
| 1 – 50 INCLUSIVE, Individually and in | ) | |
| Their Capacities as Representatives, Policy | ) | |
| Setters, and Agents of the University of | ) | |
| Notre Dame du Lac, ST. JOSEPH | ) | |
| COUNTY, INDIANA POLICE | ) | |
| DEPARTMENT, ERNIE BRYANT, | ) | |
| Individually and in his Capacity as St. | ) | |
| Joseph County, Indiana Police Department | ) | |
| Reserve Officer, and JAMES | ) | |
| RUTKOWSKI, Individually and in his | ) | |
| Capacity as St. Joseph County, Indiana | ) | |
| Police Department Merit Officer | ) | |
| Defendants. | ) | |

## PLAINTIFF'S AMENDED COMPLAINT

Comes now the plaintiff, by counsel and pursuant to Fed.R.Civ.Pro. 15(a), and for

her Amended Complaint against the defendants, states as follows:

## The Nature Of The Cause Of Action

This is a civil rights action brought pursuant to 42 U.S.C.A. §1983 for monetary damages. The action arises under the Speech and Religion Clauses of the First Amendment and under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. There are also ancillary state law claims for false arrest, false imprisonment, malicious prosecution, violations of the Indiana Constitution, and respondeat superior liability, for which monetary damages are also sought.

## JURISDICTION AND VENUE

1.      Federal court jurisdiction is conferred on this Court by 28 U.S.C.A. §§2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure and by the general legal and equitable powers of this Court. Additionally, the federal court exercises ancillary or supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C.A. §1367.

2.      Plaintiff's claims for damages are made pursuant to 42 U.S.C.A. §§ 1983 and pursuant to the common and constitutional laws of the state of Indiana.

3.      Plaintiff's request for relief regarding costs, including reasonable attorneys' fees, is authorized by 42 U.S.C.A. §1988 and by Indiana common law.

4.      Venue is proper under 28 U.S.C.A. §1391(b) because a substantial part of the acts or omissions giving rise to plaintiffs' claims occurred in this district.

## The Defendants

5.      Defendant University of Notre Dame du Lac is a not for profit corporation chartered by the Legislature of the State of Indiana.

6.      The defendant has availed itself of the provisions of the laws of the State of Indiana, Ind. Code Ann. §21-17-5-1 et seq., to appoint and supervise University police officers who possess, among other powers, "[g]eneral police powers, including the power to arrest, without process, all persons who commit any offense within the view of the officer" and "[t]he same common law and statutory powers, privileges, and immunities as sheriffs and constables."  Ind. Code Ann. §21-17-5-4 (1), (2).

7.      Said police officers exercise jurisdiction throughout St. Joseph County, Indiana.

8.      Accordingly, the defendant University police officers, at all times alleged herein, acted towards plaintiff under color of State law for purposes of 42 U.S.C.A. §1983.

9.      Through its policy and orders to restrict, arrest and incarcerate only pro-life speakers, as more particularly alleged below, the defendant University is directly liable for the actions of its police officers in carrying out that policy and those orders.

10.      For purposes of 42 U.S.C.A.§ 1983 jurisprudence, Defendant University of Notre Dame du Lac, although privately owned, exercises a "public function" as that term is used and understood pursuant to *Marsh v. Alabama,* 326 U.S. 501 (1946). As such, it is a governmental entity with regard to the proper constitutional analysis of permissible and impermissible restrictions on free speech.

11.      Like the company town of Chickasaw, Alabama in *Marsh,* Notre Dame possesses streets that run through its property and connect one municipality or subdivision to itself or another.  For example, Douglas Road, the road upon which the presidential motorcade passed, starts at St. Joseph County or Roseland on its eastern

border with State Road 933 and runs westerly through Notre Dame's campus,
connects with South Bend, then Mishawaka, then Osceola, and eventually, Elkhart,
Indiana.

12.     Like Chickasaw, Notre Dame possesses businesses open and accessible to
the general public at virtually every corner of the campus.  These businesses include
Burger King and Fed Ex Kinkos.  Notre Dame has its own police department, fire
department, and health center.  It has a federal post office on campus that is open to
the public.  And, Notre Dame is the home of two federal reserve depository libraries,
which are required to remain open and accessible to the public at all reasonable times.
According to the University's own website, Sacred Heart Basilica is the second
largest tourist attraction in the state of Indiana.  And of course, on any given Fall
Saturday, the campus hosts over 85,000 guests who wander the campus freely.

13.     Moreover, Notre Dame is a completely open campus, with the only
restriction being limited automobile access to the interior part of campus.

14.     In the alternative, by its invitation of President Obama to its May 17, 2009
commencement, which it allowed to be broadcast and stream locally and nationally,
Notre Dame, though privately owned, converted itself into a public, or limited public
forum for purposes of free speech analysis and jurisprudence.

15.     Defendant Phillip Johnson is, and at all times relevant to the allegations of
this complaint was, the Director of the Notre Dame Security Police Force ("NDSP").
He is being sued in his official and individual capacities.

16.     The NDSP maintains a collaborative and symbiotic relationship with city,
county, state and federal law enforcement agencies.

17.     Further, the NDSP, its Director and its staff officers share in the powers granted to the University by the State of Indiana pursuant to Ind. Code Ann. §21-17-5-1 et seq.

18.     As Director of the Notre Dame Security Police Department, Defendant Johnson stood and stands as a policy maker and enforcer on behalf of the University in matters related to law enforcement.

19.     Defendant Frances Shavers is and at all times relevant to the allegations of this complaint was, the Chief of Staff of Reverend John Jenkins, C.S.C, the President of the defendant University.  In that capacity, the defendant speaks for the University and shares in responsibility for the general direction of its affairs.  She is being sued in her official and individual capacities.

20.     Defendant Shavers represents the University at the highest levels of its administration, rendering her a policy maker due to the powers granted to the University and its agents pursuant to Ind. Code Ann. §21-17-5-1 et seq.

21.     The defendant Shavers is the University representative who is responsible, *inter alia,* for setting demonstration policies with and for the office of the President of the University.

22.     Upon information and belief, the defendant Shavers sat upon the committee that developed the policy to restrict pro-life or anti Obama speech.

23.     In all or some of the relevant actions as pleaded herein, the defendant Shavers acted under color of State law for purposes of 42 U.S.C.A. §1983 with regard to the Plaintiff.

5

24.     Defendants Notre Dame Security Police John Does 1 through 4 are Notre Dame Security Police Officers whose identities have not been made available through the applicable police reports.

25.     Defendants NDSP John Does 1 through 4 instigated the arrest of the Plaintiff on May 17, 2009.

26.     Defendants NDSP John Does 1 through 4 are identified by Plaintiff as Notre Dame Security Police Officers by the uniforms they wore when they confronted her, threatened her with incarceration, and restricted her freedom of movement while awaiting St. Joseph County Officers to handcuff the plaintiff and transport her to jail.

27.     Upon information and belief, these defendants were not included in the police reports of the arrest because they left the scene after directing the County police to arrest the Plaintiff.

28.     Defendants Committee Members John and Jane Does 1 through 50 are, upon information and belief, members of Notre Dame's upper administration who met regularly during the Spring of 2009 to plan the Obama visit.

29.     Upon information and belief, the planning engaged in by Defendants Committee Members John and Jane Does 1 through 50 included the development of policies and procedures for managing protests during the Obama visit.

30.     Upon information and belief, the planning engaged in by Defendants Committee Members John and Jane Does 1 through 50 included the development of policies and procedures for restricting or denying access to those who disagreed with the policies of the Obama administration.

31.     Upon information and belief, the Defendants Committee Members John and Jane Does 1 through 50 identified pro-life or anti Obama non-students as one group expected to protest on or near campus on or before the May 17, 2009 Commencement exercises.

32.     Defendant St. Joseph County, Indiana Police Department, is a law enforcement agency of St. Joseph County, Indiana, and duly authorized pursuant to Indiana law.  It is being sued in this matter for the failure to properly train Reserve Officer Ernie Bryant, and Merit Officer, Sergeant James Rutkowski with regard to the rights enjoyed by protestors pursuant to the Federal and Indiana Constitutions.

33.     Defendant Reserve Officer Ernie Bryant is a volunteer Reserve Officer for the St. Joseph County, Indiana Police Department.  He is sued in his individual and official capacity for the arrest of the plaintiff on May 17, 2009.

34.     Defendant Sergeant James Rutkowski is a Merit Officer of the St. Joseph County, Indiana Police Department.  He is sued in his individual and official capacity for the arrest of the plaintiff on May 17, 2009.

**Factual and Legal History**

35.     In the Spring of 2009, Defendant the University of Notre Dame (hereafter "University" or "Notre Dame") announced its intention to honor President Barack Obama with an honorary law degree and to make him the commencement speaker at the May 17, 2009 University Commencement.

36.     This decision was very controversial and highly publicized, due to President Obama's voting record and policy initiatives against the right to life, a core, fundamental and unequivocal teaching of the Catholic Church. Consistent with, and

pursuant to, Blessed Pope John Paul II's Constitution *Ex Corde Ecclesiae,* the teachings of Pope Benedict XVI regarding Catholics and politics, the teachings of the United States Conference of Catholic Bishops in their 2004 directive on Catholic Higher Education, over 2000 years of uninterrupted Church teaching on the sanctity of life, and in concert with the position of Diocesan Bishop in 2009, the Most Reverend John D'Arcy and over 80 of his brother Bishops and Cardinals, including the current Diocesan Bishop, the Most Reverend Kevin Rhoades, Notre Dame's decision to invite President Obama to commencement and to confer upon him an honorary doctor of law degree, was and is considered by many Church leaders and laity alike to be scandalous in nature.

37.     Policy makers at Notre Dame understood that this decision was likely to cause protests on or near campus in the lead up to, and throughout, the 2009 Commencement season.

38.     In response to Notre Dame's decision, large numbers of pro-life individuals came to Notre Dame's campus in May, 2009 to pray and to witness to the truth of the right to life.

39.     Additionally during this time, large numbers of pro choice and pro Obama individuals came onto Notre Dame's campus to demonstrate in support of their position.

40.     In anticipation of the Obama visit, Notre Dame Administrators and its security police (hereafter "Notre Dame Security Police" or "NDSP") formed one or more security committees (hereafter collectively referred to in the singular, though,

upon information and belief, there was more than one committee), ostensibly to address security concerns *vis a vis* the Presidential visit.

41.     Upon information and belief, the committee met with some frequency to, *inter alia*, develop and disseminate policies, plans and strategies for dealing with and responding to pro-life witnesses on Notre Dame's campus.

42.     Upon information and belief, one or more committee members, in committee meetings and elsewhere, spoke derogatorily about the pro-life witnesses and the pro-life movement in general.

43.     Upon information and belief, the committee, acting on behalf of the University, developed and implemented a policy with specific plans to improperly squelch and restrict the free speech rights of protesters who were identified with a pro-life or an anti Obama perspective or speech content.

44.     The University, either through its NDSP, or in symbiotic relationship with the local policing agencies, affected the mass arrests of large numbers of pro-life witnesses.

45.     At the same time, the University, either through its NDSP, or in symbiotic relationship with the local policing entities, allowed pro choice and pro Obama demonstrators a free pass to engage in demonstrations on campus, many times at the exact same time and in the exact same location where the mass arrests of pro-life speakers were occurring.

46.     These actions demonstrate a University policy to unilaterally restrict pro-life or anti Obama speech for which the University is directly liable pursuant to Section 1983.

47.     As a result of this University policy to restrict pro-life speech, from May 1 through May 17, 2009, Notre Dame, through its police officers acting as representatives of the University, in concert with the various policing bodies in the area (St. Joseph County Police Department, South Bend Police Department, Indiana State Police) effectuated over one hundred (100) arrests and incarcerations of pro-life speakers.

48.     All of those arrested were witnessing and praying peacefully as to their personal convictions in support of the Church's teaching on the paramount right to life.

49.     Among those arrested and jailed were a Catholic priest singing a traditional Marion devotional and praying the Holy Rosary, a Catholic nun dressed in full habit, two Catholic seminarians, Pastors, college professors, college students, a former U.N. Ambassador, and several other local and national pro-life leaders.

50.     On several occasions, and consistent with Notre Dame's policy, the arrests occurred in front of and along side groups of pro choice or pro Obama demonstrators, all of whom were allowed to express their political viewpoints without engagement, much less arrest, by the Notre Dame Security Police or any other policing entity.

51.     Upon information and belief, not one pro choice or pro Obama demonstrator on Notre Dame's campus was ever engaged by NDSP or asked to leave the campus.

52.     Upon information and belief, not one pro choice or pro Obama demonstrator on Notre Dame's campus was ever asked to surrender signage, end their demonstration, or leave the campus.

53.     Upon information and belief, during the relevant timeframe, not one pro choice or pro Obama demonstrator on Notre Dame's campus was arrested by NDSP or any other policing entity.

54.     On Friday afternoon, May 1, 2009, Mary Claire Chabot walked on Notre Dame's campus with a friend. Both Mary Claire and her friend were in their early twenties, and in all respects appeared to look like college students. Mary Claire was carrying a sign that read something to the effect of "Obama equals one dead baby at a time." Her friend was carrying a small baby carriage with a doll inside covered in a red substance meant to simulate the blood of an aborted baby.

55.     In front of the Notre Dame Law School just past the main circle of campus, Ms. Chabot and her friend were confronted by a female Notre Dame Security Police Officer. The Officer asked the women if they were Notre Dame students, and they replied that they were not.

56.     The Officer then told them they had to leave campus with their signage because they were not students.

57.     Just then, third year law student Anthony Bellino came out of the law school, saw what was going on, and approached the parties. Upon information and belief, Mr. Bellino then asked the Officer why the women could not walk the campus with their pro-life speech.

58.     The Officer indicated it was because the women were not students.

59.     Mr. Bellino informed the Officer that he was a third year law student, and then volunteered to carry the sign and the carriage around campus if the women would allow him to do that. During this time, one of Mr. Bellino's law professors

11

came out of the law school and identified himself to the Officer, and confirmed that Mr. Bellino was in fact a Notre Dame student.

60.     The women agreed to allow Mr. Bellino to take their signage and walk the campus.

61.     The Officer then radioed back to her supervisor(s) on the NDSP department requesting direction as to Mr. Bellino's requests to walk the campus with the signage.

62.     The NDSP Supervisor(s) then ordered the Officer to deny Mr. Bellino's request because the content of the speech was deemed to be offensive.

63.     The Officer then ordered the women off campus with their signage.

64.     On Saturday May 16, 2009, 77 year old retired Navy veteran Joseph O'Hara attempted to walk onto Notre Dame's campus by himself with a pro-life sign. He was stopped by Notre Dame Security Police Officer Richard Bliley and told he could not come onto campus with the sign.  When O'Hara refused to leave the sign off campus, he was arrested by NDSP for trespassing and incarcerated in the St. Joseph County jail.

65.     At the time and in the same location that this occurred, there were many pro choice and pro Obama demonstrators on campus.

66.     Upon information and belief, during the relevant timeframe, not one pro choice or pro Obama demonstrator on Notre Dame's campus was ever engaged by NDSP or asked to leave the campus.

67.     Upon information and belief, during the relevant timeframe, not one pro choice or pro Obama demonstrator on Notre Dame's campus was ever asked to surrender signage, end their demonstration, or leave the campus.

68.     Upon information and belief, during the relevant timeframe, not one pro choice or pro Obama demonstrator on Notre Dame's campus was arrested by NDSP or any other policing entity.

69.     On Saturday, May 16, 2009, David Templeton came to campus from his home in Huntington, Indiana to bear witness to the truth of life.

70.     As he was walking on campus in prayer with a group of pro-life witnesses, he was confronted by a large group of pro Obama supporters, all of whom were wearing shirts with the message speaking to their support of President Obama. The pro Obama demonstrators jeered and yelled at David and his group as they were attempting to process onto campus praying the Holy Rosary. (The Holy Rosary is a distinctly Catholic Devotional Prayer offered to Jesus through the intercession of his Immaculate and Blessed Mother Mary, for whom the University is named and ostensibly consecrated. It is a prayer that frequently occurs in procession, and Notre Dame routinely organizes this exact processional prayer on campus in honor of Our Lady).

71.     NDSP walked right past the pro Obama demonstrators and engaged Mr. Templeton and his prayerful friends.

72.     NDSP ordered Templeton and his friends to leave campus or be arrested.

73.     Rather than interrupt their traditional Catholic religious observance pursuant to the orders of the NDSP, they continued to proceed in prayer in honor of Our Lady.

74.     They were then arrested by NDSP and jailed in the county jail.

75.     The pro Obama demonstrators were allowed to continue demonstrating on campus with impunity, and without having applied for, or received, University permission to demonstrate.

76.     According to Phil Johnson, Director of Notre Dame Security Police at the time, no pro choice or pro Obama demonstrators were ever spoken to by NDSP to determine if they had property rights in the University or had obtained permits to demonstrate on campus.

77.     The pro choice and/or pro Obama demonstrators were simply permitted to engage in content specific speech, via clothing and signage, while the pro-life speakers were subject to police confrontation and eventually, arrest and incarceration for the content of their speech.

78.     This uneven application of the law occurred prior to May 16th, and again on May 17th, 2009, where Notre Dame specifically targeted pro-life speakers for restriction, arrest and incarceration, while allowing pro choice and pro Obama speakers free access to the campus to exercise their free speech.

79.     In total, from May 1 – 17, 2009, Notre Dame and NDSP, on their own or in concert and symbiotic relationship with the other policing entities in the area, made over 100 arrests of pro-life demonstrators on campus, and zero arrests of pro choice

or pro Obama demonstrators who were exercising content based speech right along side the pro-life demonstrators who were arrested.

### Facts Related to the Arrest of Plaintiff, Karen Torres

80.     Plaintiff Karen Torres is a resident of Virginia.  She is a 54 year old Roman Catholic, who is the mother of 7 children and the grandmother of 8.

81.     Karen Torres is pro-life – that is, she follows the teaching of the Roman Catholic Church concerning the sanctity of human life from conception to natural death.

82.     In mid-May 2009, accompanied by her husband Sonny, the plaintiff traveled to South Bend, Indiana to the campus of the defendant University of Notre Dame to pray and to bear witness to the truth of life.

83.     The plaintiff believed it was important to do so because she believes President Obama is the most ardently pro-abortion politician in the history of the United States.

84.     The plaintiff and her husband went onto the Notre Dame campus on Sunday, May 17, 2009, and participated in a peaceful prayer vigil while the graduation ceremonies were occurring inside the convocation center.

85.     Upon conclusion of the graduation ceremonies, the Torres' began their drive back to Virginia.  While still on Douglas Road, a county road that cuts through the campus, they noticed barricades on the side of the road and correctly surmised that President Obama's motorcade would soon be passing the location.

86.     The Torres' decided to exercise their rights of free speech by holding up two signs along the roadside so that the President would see them.  The signs read: "Shame On Notre Dame" and "Obama = Abortion."

87.     The plaintiff intended to stand on the public sidewalking abutting and adjoining the Notre Dame Federal Credit Union ("NDFCU") parking lot.

88.     While still in the NDFCU parking lot, Plaintiff, carrying the signs, started slowly walking towards the sidewalk.

89.     Plaintiff was approached by an unidentified Notre Dame Security Police Officer, identified herein as "NDSP Officer John Doe 1," and an unidentified St. Joseph County Police Officer.

90.     Both Officers told Mrs. Torres that she was on Notre Dame's private property and needed to leave.

91.     Noting pro Obama demonstrators congregating in the area, on both sides of the street and on the nearby sidewalk, Mrs. Torres first asked the officers where she could go in order to exercise her free speech rights.

92.     One or both of the officers, including NDSP Officer John Doe 1, told her the entire area was private property belonging to Notre Dame, and she needed to leave or face arrest.

93.     In response, Mrs. Torres indicated to the officers that she knew her constitutional rights, and that she believed she was entitled to be on the sidewalk, which she believed to be a public right of way.

94.     One or both of the officers then called for support, and at one point, Mrs. Torres was surrounded, and prevented from moving to the sidewalk, by several other

police officers, three of whom are identified herein as "NDSP Officer John Does 2-4."

95.     Thereafter, St. Joseph County Reserve Officer Ernie Bryant came to the scene, and the other officers left.

96.     Upon information and belief, defendant Bryant then interacted with Plaintiff, and in so interacting, relied upon the information that he gained from prior briefings by Notre Dame.

97.     Upon information and belief, this information included the campus boundaries as well as the rights of protestors and policies of the University towards the same.

98.     Upon information and belief, defendant Bryant had not been trained on such topics as viewpoint discrimination, retaliation for speech, and policing of peaceful protestors.

99.     As a result of all of this, Officer Bryant reiterated that Mrs. Torres was on Notre Dame's private property and that Notre Dame required her to leave, or face arrest and incarceration.

100.    When Mrs. Torres insisted on being able to stand and demonstrate next to the pro Obama demonstrators just a few feet away, Bryant called back to the Command Center located in the Notre Dame Security building for guidance.

101.    The Notre Dame Command Center then called for St. Joseph County Sergeant James Rutkowski, who upon information and belief was on routine patrol in the Roseland area, to arrest Mrs. Torres for criminal trespass.

102.     Sergeant Rutkowski arrived from the Roseland area, arrested Mrs. Torres for criminal trespass and listed the University of Notre Dame as the complaining party.

103.     Upon information and belief, Sergeant Rutkowski so identified Notre Dame as the complaining party either from a direct complaint by the NDSP at the Notre Dame Command Center, or as a result of information he had gained from prior briefings by Notre Dame.

104.     Upon information and belief, this information included the campus boundaries as well as the rights of protestors and policies of the University towards the same.

105.     Upon information and belief, defendant Rutkowski had not been trained on such topics as viewpoint discrimination, retaliation for speech, and policing of peaceful protestors.

106.     Plaintiff witnessed all of the following prior to her forced removal from the route of the presidential motorcade:  (a) Notre Dame Security Police and numerous pro choice and pro Obama demonstrators in the same area, and on both sides of the street, engaging in an organized demonstration; (b) The NDSP, as well as all other police officers present in the area, allowing the pro Obama demonstrators to congregate in the very same location that Defendant Bryant had ordered Plaintiff to abandon; (c) Pro Obama protestors traversing the credit union to get to the sidewalk where the organized pro Obama demonstration was occurring.

107.     Mr. Torres arrived on the scene before Mrs. Torres was handcuffed.  He witnessed the NDSP John Does 1 or 2 through 4 telling Mrs. Torres she was going to

get arrested if she did not leave the area.  He then witnessed the confiscation of his wife's signs and her arrest.

108.    Mr. Torres subsequently witnessed the pro choice and pro Obama demonstrators waving at the President and showing their signs and placards as the presidential motorcade passed by.  Mr. Torres witnessed the President wave to the pro choice and pro Obama demonstrators who were situated in the same prime location from which Plaintiff was forcefully removed by the will and order of the Defendants named herein.

**GENERAL STATEMENT OF LEGAL LIABILITY OF DEFENDANTS**

109.    The University of Notre Dame and St. Joseph County, Indiana, acting through their police departments, are instrumentalities of the State of Indiana. Accordingly, they were acting under color of State law with respect to this plaintiff.

110.    Those defendants therefore were obligated to observe the constitutional standards governing public protest. When private entities or individuals are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and are subject to its constitutional limitations.

111.    The police power is governmental in nature.

112.    Therefore, when the State delegates the police power to a university and its campus police, the university and its campus police are acting under color of State law.

113.    The defendant University of Notre Dame has been endowed with State power by accepting the delegation to it by the State of Indiana of the State's police power.  Ind. Code Ann. §21-17-5-1 et seq.  Accordingly, the defendant University,

the defendant Johnson, the defendant Shavers, the defendants Notre Dame Security

Officers John Does 1 through 4, and the defendants Notre Dame 2009 Security and

Commencement Committee Members John and Jane Does 1 through 50 inclusive,

were acting under color of State law with respect to this plaintiff.

114.    As state actors (or limited state actors), the University defendants and St.

Joseph County individual defendants therefore were obligated to observe the

constitutional standards governing freedom of speech.

115.    At the times in question relevant to the facts of this complaint, the roads

and sidewalks on and near or abutting the campus of the defendant University were a

traditional public forum, access to which a speaker may be denied only when the

exclusion is necessary to serve a compelling State interest and the exclusion is

narrowly drawn to achieve that interest.

116.    In the alternative, at the times in question relevant to the facts of this

complaint the roads and sidewalks on, near or abutting the campus of the defendant

University were a designated public forum in which regulations on speech are subject

to the same constitutional standards as those which govern a traditional public forum

– that is, a speaker may be denied access only when the exclusion is necessary to

serve a compelling State interest and the exclusion is narrowly drawn to achieve that

interest.

117.    Also in the alternative, at the times in question relevant to the facts of this

complaint the roads and sidewalks on, near or abutting the campus of the defendant

University were a non-public forum which may be reserved for its intended purposes,

communicative or otherwise, but only by means of a regulation of speech which is reasonable and viewpoint-neutral.

118.    The individually named defendants are guilty of actual malice or reckless or callous disregard of plaintiffs' constitutional rights, as pleaded more particularly below, in that they: (a) purposely decided to police in an unconstitutional manner; (b) deliberately arrested plaintiff and other similarly situated pro-life advocates according to a plan to deter and punish their pro-life speech as directed against the President, while allowing pro-Obama advocates to demonstrate with impunity in the same location; and (c) willfully failed to train or supervise the arresting officers concerning their duty to enforce the law without discrimination and to respect the rights of protesters in public fora, according to well-established constitutional standards governing freedoms of assembly, speech, free exercise, association, equal protection and other applicable legal standards pled herein.

119.    Accordingly, the defendants subjected the plaintiff, either by their policy or by their direct involvement with her, to the deprivation of rights secured to her by the Constitution of the United States, in violation of 42 U.S.C.A. § 1983 as pleaded more particularly below.

120.    As a result of defendants' actions, plaintiff has suffered damages.

## COUNT I.  SECTION 1983 – FIRST AMENDMENT

### (FREEDOM OF SPEECH)

121.    The allegations set forth in Paragraphs 1 through 120 of this complaint are incorporated by reference.

122.    As applied through the Fourteenth Amendment to the United States Constitution, the First Amendment of that Constitution specifies that a State shall make "no law … abridging the freedom of speech…."

123.    Arrest and incarceration of peaceful protestors on public, quasi-public, or dedicated public forums constitutes such an abridging of this freedom.

124.    The defendants (except St. Joseph County) failed to observe the applicable constitutional standards governing the free exercise of speech.  Accordingly, they subjected the plaintiff to the deprivation of rights secured to her by the Constitution of the United States, in violation of 42 U.S.C.A. § 1983.

125.    As a result of defendants' actions, plaintiff has suffered damages.

## COUNT II.  SECTION 1983 - FIRST AMENDMENT

(FREEDOM OF RELIGION)

126.    The allegations set forth in Paragraphs 1 through 120 of this complaint are incorporated by reference.

127.    As applied through the Fourteenth Amendment to the United States Constitution, the First Amendment of that Constitution specifies that a State shall make "no law … prohibiting the free exercise [of religion]…."

128.    A State substantially and unconstitutionally burdens the free exercise of religion when it significantly constrains conduct or expression that manifests a central tenet of a person's religious beliefs, meaningfully curtails the ability to express adherence to a particular faith or denies reasonable opportunities to engage in fundamental religious activities.

129.   The defendants failed to observe the applicable constitutional standards governing the free exercise of religion.  Accordingly, they subjected the plaintiff to the deprivation of rights secured by the Constitution of the United States, in violation of 42 U.S.C.A. § 1983.

130.   As a result of defendants' actions, plaintiff has suffered damages.

## COUNT III.  SECTION 1983 - FIRST AMENDMENT

### (FIRST AMENDMENT RETALIATION)

131.   The allegations set forth in Paragraphs 1 through 120 of this complaint are incorporated by reference.

132.   At the time of her arrest, plaintiff was engaged in constitutionally protected speech and assembly.

133.   At the time of her arrest plaintiff suffered a deprivation of First Amendment rights that was likely to deter her free speech, and did in fact deter her free speech when she was arrested and detained without probable cause.

134.   Plaintiff's exercise of her free speech rights was a motivating factor in the defendants' decision to arrest and imprison her.

135.   As a result of defendants' actions, plaintiff has suffered damages.

## COUNT IV. SECTION 1983 - FOURTH AMENDMENT

### (FALSE ARREST AND IMPRISONMENT)

136.   The allegations set forth in Paragraphs 1 through 120 of this complaint are incorporated by reference.

137.   Plaintiff was deprived of her Fourth Amendment right to be free from unreasonable and unlawful arrest and imprisonment without probable cause.

138. As a result of defendants' actions, plaintiff suffered damages.

## COUNT V. SECTION 1983 – FOURTEENTH AMENDMENT

### (EQUAL PROTECTION)

139. The allegations set forth in Paragraphs 1 through 120 of this complaint are incorporated by reference.

140. The Fourteenth Amendment to the United States Constitution provides that "[no State shall] deny to any person within its jurisdiction the equal protection of the laws."

141. The defendants prevented the plaintiff from freely exercising her First Amendment rights of speech and religion while allowing other persons having other views and similarly situated to express those views. Accordingly, they denied the plaintiffs the equal protection of the laws, in violation of 42 U.S.C.A. § 1983.

142. As a result of defendants' actions, plaintiff suffered damages.

## COUNT VI. SECTION 1983 - NEGLIGENT TRAINING AND SUPERVISION

143. The allegations set forth in Paragraphs 1 through 120 of this complaint are incorporated by reference.

144. As policing entities authorized and empowered by the State of Indiana, the St. Joseph County Police Department and Notre Dame's security department have a duty to train and supervise their officers to apply and enforce the law within the strictures and limitations of the Federal Constitution.

145. Upon information and belief, the St. Joseph County Police Department and Notre Dame failed to train and supervise the individually named defendants on

such topics as viewpoint discrimination, retaliation for speech, and policing of peaceful protestors.

146.     As a result this failure to train and supervise, plaintiff has suffered damages.

## COUNT VII. INDIANA CONSTITUTION

147.     The allegations set forth in Paragraphs 1 through 120 of this complaint are incorporated by reference.

148.     By their actions, the defendants prevented the plaintiff from freely exercising her right of worship, her right to free expression of religious opinions, her right to free practice of religion, her rights of assembly, and her right to free exercise of speech, in violation of the Indiana Constitution, Article 1, §§ 2, 3, 4, 9, 11 and 31 respectively.

149.     As a result of defendants' actions, plaintiff has suffered damages.

## COUNT VIII.  COMMON LAW FALSE ARREST

150.     The allegations set forth in Paragraphs 1 through 120 of this complaint are incorporated by reference.

151.     The defendants, acting under authority of law, prevented or hindered plaintiff's freedom of movement without a warrant or probable cause to believe plaintiff had engaged, or was engaging, in illegal activity.

152.     By their actions, the defendants (except St. Joseph County) engaged in or directed the false arrest of plaintiff, pursuant to Indiana common law.

153.     The police officer defendants directly engaged in false arrest.

154.    With regard to the other defendants, their actions in developing and implementing a policy of aggressively restricting pro-life speech, and incarcerating pro-life speakers, foreseeably led to, and caused the false arrest of the plaintiff.

155.    As a result of defendants' actions, plaintiff suffered damages.

## COUNT IX.  COMMON LAW FALSE IMPRISONMENT

156.    The allegations set forth in Paragraphs 1 through 120 of this complaint are incorporated by reference.

157.    The defendants, acting under authority of law, participated in the custodial arrest and incarceration of the plaintiff without a warrant or probable cause to believe plaintiff had engaged, or was engaging, in illegal activity.

158.    By their actions, the defendants engaged in or directed the false imprisonment of plaintiff, pursuant to Indiana common law.  The police officer defendants directly engaged in false imprisonment when they unlawfully arrested and incarcerated plaintiff without probable cause.  With regard to the other defendants, their actions in developing and implementing a policy of aggressively restricting pro-life speech, and incarcerating pro-life speakers, foreseeably led to, and caused the false imprisonment of the plaintiff.

159.    As a result of defendants' actions, plaintiff suffered damages.

## COUNT X.  MALICIOUS PROSECUTION

160.    The allegations set forth in Paragraphs 1 through 120 of this complaint are incorporated by reference.

161.    By their actions, the defendants instigated a criminal prosecution against plaintiff, in the absence of probable cause.

162.     The same defendants acted with malice towards the plaintiff in instigating legal proceedings against her, which proceedings terminated in her favor by a decision of the St. Joseph County Prosecutor determining not to prosecute the plaintiff.

163.     The defendants' actions constitute malicious prosecution under Indiana common law.

164.     As a result of defendants' actions, plaintiff suffered damages.

### COUNT XI.  COMMON LAW
### NEGLIGENT TRAINING AND SUPERVISION

165.     The allegations set forth in Paragraphs 1 through 120 of this complaint are incorporated by reference.

166.     As policing entities authorized and empowered by the State of Indiana, the St. Joseph County Police Department and Notre Dame's security department have a duty to train and supervise their officers to apply and enforce the law within the strictures and limitations of Indiana law.

167.     Upon information and belief, the St. Joseph County Police Department and Notre Dame failed to train and supervise the individually named defendants on such topics as viewpoint discrimination, retaliation for speech, and policing of peaceful protestors.

168.     As a result this failure to train and supervise, plaintiff has suffered damages.

### REQUEST FOR RELIEF

WHEREFORE, plaintiff seeks judgment from this court for the following relief:

A.  A declaratory judgment that the individually named defendants' acts and defendant Notre Dame's policy and practice were unconstitutional and tortious and that plaintiff's rights were violated thereby;

B.  Injunctive relief barring the defendants from such acts in the future;

C.  An award of compensatory and punitive damages in favor of the plaintiff and against the defendants;

D.  An award of plaintiff's reasonable attorneys' fees, costs and expenses pursuant to 42 U.S.C.A. §1988(b) and Indiana common law to the extent available.

E.  Such other relief as this Court may deem just and proper.

## **JURY DEMAND**

The plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,


Thomas M. Dixon, Esq. (18611-71)
Dixon, Wright & Associates, P.C.
55255 Birchwood Court
Osceola, IN  46561
(574) 315-6455
(574) 675-7783 fax

Attorney for Plaintiff Karen Torres

Dated:      May 22, 2011