## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

```
KAREN TORRES                    )
                                )
Plaintiff,                      )
                                )
     v.                         )          No.  3:11-CV-209
                                )
THE UNIVERSITY OF NOTRE         )
DAME DU LAC, et al.,            )
                                )
Defendants.                     )
```

### OPINION AND ORDER

     This matter is before the Court on the Motion to Dismiss, filed on July 29, 2011, by Defendants, The University of Notre Dame du Lac; Phillip Johnson, individually and in his official capacity; Frances Shavers, individually and in her official capacity; John Does 1-4, individually and in their official capacity as Notre Dame Security Officers; and Jane and John Does 1-50, individually and in their official capacity as Notre Dame 2009 Security and Commencement Committee Members (collectively "Notre Dame Defendants"). For the reasons set forth below, the motion is **DENIED**.


BACKGROUND

     This lawsuit stems from the arrest of Plaintiff Karen Torres ("Torres") on May 17, 2009, as she attempted to express

1

her opposition to abortion through peaceful demonstration on or near the University of Notre Dame du Lac ("Notre Dame"), a Catholic university. The following facts are based on the allegations of the amended complaint, which this Court accepts as true at this stage of the litigation.

Notre Dame is a privately owned not-for-profit corporation chartered by the Legislature of the state of Indiana. (Am. Compl. at ¶¶ 5, 10). In the spring of 2009, Notre Dame announced it would honor President Barack Obama with an honorary law degree and that President Obama would be the commencement speaker at the May 17, 2009, Notre Dame Commencement. (Id. at ¶ 35). This decision was controversial and highly publicized due to President Obama's voting record and policy initiatives with regard to abortion, which Torres characterizes as "against the right to life, a core, fundamental and unequivocal teaching of the Catholic Church." (Id. at ¶ 36). Therefore, the policy makers at Notre Dame understood that this decision was likely to cause protests on or near campus leading up to, and throughout, the 2009 Commencement season. (Id. at ¶ 37).

In anticipation of President Obama's visit, Notre Dame administrators and its security police ("Notre Dame police") formed one or more security committees to address security concerns regarding the presidential visit. (Id. at ¶ 40). Torres contends that these committees met with some frequency to

2

develop and disseminate policies, plans and strategies for dealing with and responding to pro-life demonstrators[1] on Notre Dame's campus. (Id. at ¶ 41). Moreover, Torres contends that these committees developed and implemented a policy with specific plans to "improperly squelch and restrict" the speech of demonstrators who were identified as delivering a pro-life or anti-Obama message. (*Id.* at ¶ 43).

As expected, large numbers of both pro-life and pro-choice supporters migrated to Notre Dame's campus to demonstrate in support of their respective positions. (Id. at ¶¶ 38-39). Acting pursuant to the aforementioned policy, Notre Dame targeted and helped to facilitate the arrests of a large number of pro-life demonstrators either through its police department or by way of a symbiotic relationship with local law enforcement. (Id. at ¶ 44). Specifically, from May 1-17, 2009, Notre Dame and the Notre Dame police, on their own or with the assistance of local law enforcement, made over 100 arrests of pro-life demonstrators on the campus. (Id. at ¶¶ 47, 79). Included among those arrested and incarcerated were a Catholic priest who had been singing and praying the Holy Rosary, a Catholic nun, two Catholic seminarians, pastors, professors, students, a former U.N. Ambassador, and several other local and national pro-life

---

[1] The amended complaint uses the word "witnesses" to describe protestors with a pro-life or anti-Obama message and "demonstrators" to describe protestors with a pro-choice or pro-Obama message. In this Order, both groups will be referred to as demonstrators or protestors.

leaders. (Id. at ¶ 49). During this same time frame no arrests were made of pro-choice or pro-Obama demonstrators who were often exercising their free speech rights in close proximity to the pro-life persons who had been arrested. (Id. at ¶¶ 50-51, 79). In sum, Torres alleges that Notre Dame's policy had the practical effect of permitting pro-choice and pro-Obama demonstrators to engage in verbal and expressive speech through the use of clothing and signs to communicate their message, while the pro-life demonstrators, including Torres, were subject to police confrontation and incarceration for engaging in similar behavior. (Id. at ¶¶ 50-51,77).

Torres is 54 years old, a resident of Virginia, and a devout Roman Catholic and pro-life supporter. (Id. at ¶¶ 80-81). In mid-May 2009, Torres and her husband traveled to the Notre Dame campus to pray and demonstrate in support of the pro-life cause. (Id. at ¶ 82). On May 17, 2009, the day President Obama was delivering his commencement speech to the Notre Dame graduating class, Torres and her husband were on the Notre Dame campus participating in a prayer vigil during the same time as the graduation ceremonies. (Id. at ¶ 84).

After the graduation ceremonies had concluded, the Torres' began their drive back to Virginia. (Id. at ¶ 85). While still on Douglas Road, a county road that cuts through the campus, the Torres' noticed barricades that had been placed on the side of

the road because President Obama's motorcade would soon be passing through the location. (Id.). The Torres' intended to display two signs while standing on a public sidewalk near the roadside which both abutted and adjoined the Notre Dame Federal Credit Union ("Credit Union") parking lot. (Id. ¶¶ 86-87). The signs read "Shame on Notre Dame" and "Obama = Abortion." (Id. at ¶ 86).

While in the Credit Union parking lot and attempting to make her way toward the sidewalk with her two signs, Torres was approached by an unidentified Notre Dame police officer and an unidentified St. Joseph County police officer. (Id. at ¶ 89). Both of the officers informed Torres that she was on Notre Dame's private property and that she needed to leave. (Id. at ¶ 90). Upon noting that pro-Obama demonstrators were congregating in the area, on both sides of the street and on the nearby sidewalk, Torres asked the officers where she could go to display her signs. (Id. at ¶ 91). One or both of the officers responded by telling her that the entire area was private property belonging to Notre Dame and that she needed to leave or face arrest. (Id. at ¶ 92). In response to this statement Torres informed the officers that she knew her constitutional rights, and that she believed she was entitled to be on the sidewalk, which she believed to be a public right of way. (Id. at ¶ 93). One or both of the officers then called for support and, at one

point, Torres was surrounded, and prevented from moving to the sidewalk, by three unidentified Notre Dame police officers. (Id. at ¶ 94). Shortly afterward St. Joseph County Reserve Officer Ernie Bryant ("Bryant") came to the scene, and the other officers left. (Id. at ¶ 95).

Torres contends that Officer Bryant communicated with her while relying on information that he had gained from prior briefings by Notre Dame; namely the campus boundaries, the rights of protestors, and Notre Dame's policies toward those protestors. (Id. at ¶¶ 96-98). Torres further contends that Officer Bryant had not received training on topics such as viewpoint discrimination, retaliation for speech, and policing of peaceful protestors. (Id. at ¶ 98). Torres asserts that as a result of these prior briefings by Notre Dame and lack of training, Officer Bryant merely reiterated to her that she was on Notre Dame's private property and that Notre Dame required her to leave or face arrest and incarceration. (Id. at ¶ 99). Torres insisted on being able to stand and demonstrate next to pro-Obama demonstrators who were just a few feet away, which prompted Officer Bryant to call the Command Center located within the Notre Dame security building for guidance. (Am. Compl., ¶ 100).

The Command Center then called for St. Joseph's County Sergeant James Rutkowski who arrived at the scene and

effectuated the arrest of Torres for criminal trespass. (Id. at ¶¶ 101-02). Notre Dame was listed as the complaining party. (Id., at ¶ 102). Torres asserts that Sergeant Rutkowski knew to list Notre Dame as the complaining party either from a direct complaint by the Notre Dame police from within the Command Center, or as a result of information he had gained from prior briefings by Notre Dame; such as the campus boundaries as well as the rights of protestors and Notre Dame's policy towards those protestors. (Id., at ¶¶ 103-04). Additionally, Torres asserts that Sergeant Rutkowski, similar to Officer Bryant, did not receive training in topics such as viewpoint discrimination, retaliation for speech, and policing of peaceful protestors. (Id., at ¶ 105).

Torres contends that she witnessed the following events transpire prior to her arrest and removal from the route of the presidential motorcade: Notre Dame police and numerous pro-choice and pro-Obama demonstrators in the same area, and on both sides of the street, engaging in an organized demonstration; the Notre Dame police, as well as all other police officers present in the area, allowing the pro-Obama demonstrators to assemble in the very same location that she had been ordered to leave from; and Pro-Obama demonstrators walking through the Credit Union parking lot to get to the sidewalk where the organized pro-Obama demonstration was occurring. (Id. at ¶ 106).

Based on the foregoing, Torres filed a 28 page amended complaint asserting 11 different counts against the Defendants. The amended complaint includes six separate counts under 42 U.S.C. § 1983: violation of Torres' rights under the First Amendment's free speech clause (Count I); violation of her rights under the First Amendment to freely express her religion (Count II); retaliation motivated by the exercise of her First Amendments rights (Count III); false arrest and imprisonment in violation of her Fourth Amendment rights (Count IV); a violation of the Equal Protection Clause of the Fourteenth Amendment (Count V); and negligent training and supervision of the St. Joseph's County and Notre Dame police officers (Count VI). Additionally, Torres claims violations of her right to freedom of speech and religion under the Indiana Constitution (Count VII). Torres also raises a number of claims under Indiana common law: false arrest (Count VIII), false imprisonment (Count IX), malicious prosecution (Count X), and negligent training and supervision (Count XI).

In response, the Notre Dame Defendants filed the instant motion to dismiss Torres' amended complaint, asserting that it failed to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Notre Dame Defendants contend that Torres has failed to show that they were engaged in any state action in connection with her arrest that would subject them to

suit under § 1983. Moreover, the Notre Dame Defendants contend that, even if there is a finding of state action, Torres has failed to show a constitutional violation sufficient to show liability under *Monell v. Dept. of Social Services of N.Y.*, 436 U.S. 658 (1978). The Notre Dame Defendants further contend that all of Plaintiff's state law claims should be dismissed because the Court should relinquish jurisdiction after determining that all of Torres' federal law claims must be dismissed. Alternatively, the Notre Dame Defendants argue that the Indiana state common law claims should be dismissed because Notre Dame officers did not arrest, detain or prosecute Torres and the claims pursuant to the Indiana Constitution should be dismissed because Indiana's Constitution does not provide a private right of action. Plaintiff filed a brief in opposition to the motion on September 21, 2011, and the Notre Dame Defendants filed a reply brief on December 9, 2012. The motion is fully briefed and ripe for adjudication.


DISCUSSION

Federal Rule of Civil Procedure 12(b)(6) allows a complaint to be dismissed if it fails to "state a claim upon which relief can be granted." Allegations other than fraud and mistake are governed by the pleading standard outlined in Federal Rule of

Civil Procedure 8(a), which requires a "short and plain statement" that the pleader is entitled to relief.

In order to survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). All well-pleaded facts must be accepted as true, and all reasonable inferences from those facts must be resolved in the plaintiff's favor. *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008). However, a plaintiff may plead herself out of court if the complaint includes allegations that show she cannot possibly be entitled to the relief sought. *McCready v. eBay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006).

The "under color of state law" requirement of 42 U.S.C. § 1983

42 U.S.C. § 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress….

Section 1983 "does not create substantive rights; rather, 'it is a means for vindicating federal rights conferred elsewhere'."

*Padula v. Leimbach*, 656 F.3d 595, 600 (7th Cir. 2011) (quoting *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997)). Thus, in order to state a valid claim for relief under § 1983, the "[plaintiff] must establish that [she was] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *American Manufacturers Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999); *Padula*, 656 F.3d at 600.

Torres' claims under the United States Constitution are based on the First, Fourth, and Fourteenth Amendment. In addition to the "under color of state law" requirement of § 1983, violations of the First, Fourth, and Fourteenth Amendments each require state action since these provisions are aimed at protecting citizens from conduct by the government and not from the conduct of purely private actors. *See Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488, U.S. 179, 191(1988); *Hallinan v. Fraternal Order of Police of Chicago Lodge No.* 7, 570 F.3d 811, 815 (7th Cir. 2009); *Pepper v. Village of Oak Park*, 430 F.3d 805, 809 (7th Cir. 2005). "If a defendant's conduct satisfies the state-action requirement . . . [that] conduct also constitutes action 'under color of state law' for § 1983 purposes." *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295, n.2 (2001) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982)).

"The conduct of private actors, in some instances, can constitute state action" for § 1983 purposes. *Hallinan,* 570 F.3d at 815. The Court of Appeals for the Seventh Circuit, in *Hallinan*, provides a summary of the kinds of situations where private actors can become state actors.

> Private action can become state action when private actors conspire or are jointly engaged with state actors to deprive a person of constitutional rights; where the state compels the discriminatory action; when the state controls a nominally private entity; when it is entwined with its management or control; when the state delegates a public function to a private entity; or when there is such a close nexus between the state and the challenged action that seemingly private behavior reasonably may be treated as that of the state itself.
>
> Over time, Supreme Court and Seventh Circuit precedent have revealed that these cases do not so much enunciate a test or series of factors, but rather demonstrate examples of outcomes in a fact-based assessment.

*Hallinan,* 570 F.3d at 815 (internal citations omitted). *See also Brentwood Academy*, 531 U.S. at 295 (2001). With all of this in mind, the Court turns to the instant case. Although the Notre Dame Defendants assert that the Plaintiff's amended complaint alleges that the Notre Dame Defendants are state actors under three separate theories, as can be seen from the Seventh Circuit's opinion in *Hallinan*, these different theories of state action overlap somewhat, and are not to be applied in a rigid, test-like manner. *See Tarpley v. Keistler*, 188 F.3d 788, 792

(7th Cir.1999) ("All of the tests, despite their different names, operate in the same fashion: [ ] by sifting through the facts and weighing circumstances.").

One of the theories that Plaintiff relies upon is the delegation of a public function that has been traditionally reserved to the State. *See Brentwood Academy*, 531 U.S. at 295; *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 626-628 (1991); *Wade v. Byles*, 83 F.3d 902, 905 (7th Cir. 1996). Plaintiff contends that police powers have been traditionally reserved to the state.  While the Supreme Court has left open the question of whether private police officers can be held liable as state actors under § 1983, *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 163-64 (1978), courts in the Seventh Circuit recognized that state action can exist in some situations where state or local law delegates police powers to a private entity.  *See Payton v. Rush-Presbyterian-St. Luke's Medical Center,* 184 F.3d 623, 630 (7th Cir. 1999); *U.S. v. Hoffman*, 498 F.2d 879, 881 (7th Cir. 1974); *but see Johnson v. LaRabida Children's Hosp.,* 372 F.3d 894, 897 (7th Cir. 2004).

In *Payton,* the Seventh Circuit found that a security guard at a medical center who was also a special Chicago police officer could be considered a state actor.  184 F.3d at 630.  In reaching this decision, the Court noted that "no legal difference exists between a privately employed special officer

13

with full police powers and a regular Chicago police officer." *Id.*

The holding in *Payton* was consistent with the Seventh Circuit's earlier holding in *Hoffman*. *United States v. Hoffman*, 498 F.2d 879, 881 (7th Cir. 1974). In *Hoffman*, the Seventh Circuit upheld a jury verdict of guilty on a 13-count indictment charging railroad police officers with violating several individuals' constitutional rights and conspiring to violate their constitutional rights. The criminal charges required a finding that privately employed railroad policemen, also Chicago special police officers, were acting under color of law. In upholding the verdict, the Seventh Circuit noted that the defendants were "authorized on a continuing and full-time basis to search actively for criminals and trespassers and to use the powers of the state when their search [was] successful." *Id.* at 881.

In contrast, in *Johnson v. LaRabida Children's Hosp.,* the Seventh Circuit distinguished a security guard at the hospital, also a special Chicago police officer, from the officers in *Hoffman* and *Payton* because the security guard had limited authority in his role as a hospital security officer. 372 F.3d at 897. The Court noted that the officer's duties were "routine security duties only" and that the officer was not authorized to carry a firearm or to carry out the function of a police

officer.   Under his employer's policy, when an individual such as the plaintiff became unruly or disruptive, the officer's only recourse was to call 911 for assistance.   The officer in *Johnson* was deemed "no substitute for the police."   *Id.* at 897.

In combination, these cases make clear that a finding of state action in this context requires that there be virtually no legal difference between a private actor who has been given police powers and a regular police officer employed within the state.   *Payton,* 184 F.3d at 630; *Hoffman*, 498 F.2d at 881; *Johnson*, 372 F.3d at 897.

At least two district courts within this Circuit have applied these cases in the context of private university police forces.   The United States District Court for the Northern District of Illinois addressed this question in 1999, in *Scott v. Northwestern Univ. Sch. of Law,* 1999 WL 134059, *3-6 (N.D. Ill. 1999).   *Scott*, not a student of Northwestern University, entered the Northwestern University School of Law Library during a final examination period.   The law school restricted library access to Northwestern students during final examinations. After Scott had spent several hours at the library, Northwestern University police officers approached Scott and questioned him regarding a theft.   Scott was placed under arrest, taken to the University's detention center, and then turned over to the Chicago Police Department where he was imprisoned for seventeen

15

hours.  An Illinois statute allows private universities to appoint police officers and grants these officers the powers of municipal peace officers and county sheriffs, including the power to make arrests on college or university property for the protection of students, employees, visitors and their property, and the property of the university.  The Court noted that:

> [O]n University property a member of Northwestern's police force is every bit the law enforcement officer as is a member of the Chicago Police Department when one walks off the University's downtown property and onto a public thoroughfare.
> This is true because the state has so authorized the Northwestern University police.  By accepting this authorization, Northwestern and its police must also accept the grave responsibility to protect an individual's constitutional rights, the same responsibility that § 1983 enforces against municipal and other police forces.  To permit the state to delegate its police powers to Northwestern University and then shield the Northwestern police force from liability when, in exercising these powers, it violates the rights of "students, employees, [and] visitors" would pervert the language and intent of § 1983.

*Id.* at *5-6.  Defendants' motion to dismiss for failure to state a claim was denied with regards to Plaintiff's § 1983 claim, and the claim was allowed to continue against Northwestern University.

More recently, in *Boyle v. Torres*, 756 F. Supp. 2d 983, 993-96 (N.D.Ill. 2010), the United States District Court for the Northern District of Illinois addressed this question in the

context of a summary judgment motion. The plaintiff claimed that
an incident of police questioning by an officer of the
University of Chicago Police Department ("UCPD") turned into a
brutal beating when he asked the officer why he needed to show
his identification. The Chicago Police Department ("CPD")
arrived to assist, but the CPD officers allegedly watched the
beating continue. When the UCPD officers were done, they
brought the plaintiff to the CPD officers, who in turn
transported the plaintiff to the police station and charged him
with resisting arrest. Plaintiff relied on the Illinois statute
conferring full police powers on the UCPD to support his
argument that the UCPD officers were state actors for purposes
of § 1983. The UCPD officers attempted to distinguish the case
from *Scott* and others like it by claiming that they do not
actually exercise full police powers. They argued that although
they may have the authority to make arrests, they do not
exercise that authority, but instead detain suspects and call
the CPD for assistance. The court was not persuaded that the
fact that they do not actually perform arrests justified an
outcome different than that of *Scott*. The Court noted that:

> In any event, there can be no question
> that the UCPD's role is one that has
> traditionally been the exclusive prerogative
> of the state: they carry guns, they wear
> police uniforms, and they patrol their
> territory in squad cars; they have the
> ongoing authority to detain citizens and

> place them in handcuffs; they have the
> authority to demand that individuals furnish
> them with ID. When the ensemble of the
> officers' powers and functions is kept in
> view, there can be no doubt that they are
> state actors.

*Id.* at 995.

Indiana has a statute that is very similar to the Illinois statute at issue in *Scott* and *Boyle*. Indiana Code § 21-17-5-2 provides that:

> The governing board of an educational
> institution may do the following:
>
> (1) Appoint police officers for the
> educational institution for which it is
> responsible.
>
> (2) Prescribe the duties of police officers
> of the educational institution and direct
> their conduct.
>
> (3) Prescribe distinctive uniforms for the
> police officers of the educational
> institution or campus.
>
> (4) Designate and operate emergency
> vehicles.

I.C. § 21-17-5-2. These officers "serve at the pleasure of the appointing governing board." I.C. § 21-17-5-3. Additionally, the statute provides that "[p]olice officers appointed under this chapter have . . . [g]eneral police powers, including the power to arrest, without process, all persons who commit any offense within the view of the officer . . . ." I.C. § 21-17-5-4. These powers are limited to the "real property owned or occupied

18

by the educational institution employing the police officer" but an institution can expand the officer's territorial jurisdiction to the entire state, if it follows certain procedures.  I.C. § 21-17-5-5.  The Indiana Supreme Court has interpreted this broad statutory grant of "general police powers" as rendering the conduct of a police officer employed by a private university state action. *Finger v. State*, 799 N.E.2d 528, 532 (Ind. 2003)(concluding that that Butler University police officers are subject to constitutional restraints due to the Indiana statute conferring general police powers on university police officers).

Turning to the instant case, it is undisputed that Notre Dame is a private university. By statute, the state of Indiana has chosen to delegate its general policing powers to private universities, such as Notre Dame, that are located in the state. The broad grant of power to police officers for private universities leaves little to differentiate them from any other police officer in the state of Indiana, at least if they are on the university's property.  It can be inferred from the complaint that Notre Dame accepted this delegation of power. Accordingly, the complaint sufficiently alleges state action with regards to the Notre Dame police officers when exercising the police powers granted to them by Indiana's law.

The Notre Dame Defendants argue that, even if the Notre Dame Police Officers are sometimes state actors, the Plaintiff's

amended complaint does not sufficiently allege state action because it does not allege that the Notre Dame police officers actually arrested Torres.   In her amended complaint, Torres alleged that she was initially stopped by an unidentified Notre Dame security officer and an unidentified St. Joseph's County police officer. One or both of these officers informed her that she was on Notre Dame's private property and that if she did not leave she would be arrested. Torres further alleges that after she refused to leave, the Notre Dame police officer called for backup and several more unidentified Notre Dame police officers arrived at the scene and surrounded her. Communications took place between St. Joseph's County police present at the scene and the Command Center located in Notre Dame's security building. After these communications, Torres was arrested for criminal trespass by a St. Joseph County police officer, not a member of the Notre Dame police force. The Notre Dame Defendants would have this Court look at only one specific point in time while ignoring the allegedly substantial involvement of the Notre Dame police officers to help effectuate an arrest that, under Indiana law, they were empowered to make on their own. The Court is not persuaded by the Notre Dame Defendants' argument.

The Notre Dame Defendants contends that, even if the Notre Dame police officers are state actors, Plaintiff's amended

complaint does not allege any basis on which to find that the university itself, members of the Security and Commencement Committee, Phillip Johnson (Director of the Notre Dame Security Police Force), or Frances Shavers (Chief of Staff to the university's president) are also state actors.   Plaintiff, however, suggests that the president and his designees are the equivalent of the chief of police for the Notre Dame officers, and that the administration's exercise of authority over its police officers makes it a state actor when those powers are exercised.   In rejecting these arguments, the Notre Dame Defendants state that "*Monell* prohibits grounding constitutional liability on such remote and general assertions."   (DE 26 at 11).   The requirements of *Monell* are not to be confused with the requirement of state action.   *Monell v. Dept. of Social Services of N.Y.*, 436 U.S. 658 (1978).   The university, Phillip Johnson, Frances Shavers, and the members of the security and commencement committee can be deemed state actors, just like the police officers themselves, to the extent that they are exercising their authority to direct and supervise the conduct of the police officers.   Whether *Monell* is satisfied such that liability can attach for unconstitutional acts is a different question entirely.

Because this Court has found allegations of state action sufficient based on a theory of delegation of power, this Court

need not consider Plaintiff's other theories, including that Notre Dame is a company town pursuant to *Marsh v. Alabama*, 326 U.S. 601 (1946), or that the state and the Notre Dame Defendants have a symbiotic relationship pursuant to *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961).  The Court's holdings in these cases have been somewhat narrowed over time, and this Court expresses doubt that the facts of this case fit squarely within either *Marsh* or *Burton*, but these questions may not need to be resolved at all, and at a minimum, given the fact sensitive nature of the issue, these questions are more appropriately addressed at a later stage of the proceedings.  At this point, it is enough that the amended complaint adequately puts the Notre Dame Defendants on notice of Plaintiff's claims, and in fact, provides a good deal more detail than is required under Rule 8.[2]


Plaintiff's allegations of an unconstitutional policy or custom
=====

The Notre Dame Defendants argue that even if this Court finds state action, Plaintiff's claims must fail because she has not sufficiently alleged a policy or custom as required by *Monell v. Dept. of Social Services of N.Y.*, 436 U.S. 658 (1978). *Monell* established that a municipality is subject to liability

---

[2] Plaintiff appears to have abandoned her theory that Notre Dame is transformed into a state actor by inviting President Obama to deliver its commencement address.

under § 1983 only when the violation of the plaintiff's
federally protected right can be attributable to the enforcement
of a municipal policy, practice, or decision of a final
municipal policy maker. *Monell*, 436 U.S. 658 (1978). The
rationale of *Monell* has been extended to private corporations.
*See Rice ex. Rel. Rice v. Correctional Medical Services*, Nos.
09-2804, 10-2389, 2012 WL 917291, at *20 (7th Cir. March 20,
2012). Under *Monell*, a plaintiff must demonstrate that:

> [t]he unconstitutional act complained of is
> caused by: (1) an official policy adopted
> and promulgated by its officers; (2) a
> governmental practice or custom that,
> although not officially authorized, is
> widespread and well settled; or (3) an
> official with final policy-making authority.

*Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th
Cir. 2009).

The Notre Dame Defendants argue that Plaintiff has not
sufficiently alleged causation, as required by *Monell*. It is
alleged that Notre Dame administrators and its security police
formed one or more security committees to address security
concerns regarding the presidential visit. The amended
complaint further alleges that these committees developed and
implemented a policy with a specific plan to "improperly squelch
and restrict" the speech of demonstrators who were identified as
delivering a pro-life or anti-Obama message. It is the carrying

out of this allegedly unlawful policy that allegedly resulted in Torres' arrest.  Causation has been sufficiently alleged.

The Notre Dame Defendants also argue that the complaint does not sufficiently allege a persistent, widespread pattern of unconstitutional arrests because its allegations are limited to events occurring in an approximately two-week period.   In support of this claim, Defendants cite to *Wells v. Bureau County*, 723 F.Supp.2d 1061 (C.D. Ill. 2010).  In *Wells*, the Court noted that a single incident of unconstitutional activity is insufficient to impose liability on a municipality under *Monell* unless there is proof it was caused by an existing, unconstitutional municipal policy.  Plaintiff alleges that over 100 arrests occurred as a result of Notre Dame's policy toward pro-life or anti-Obama demonstrators.  If proved, this would support a finding that there was a widespread pattern of unconstitutional arrests.  Because Torres is alleging a widespread policy or practice, she does not need to identify any particular Notre Dame official who can be considered a final policy-making officer in connection with her arrest.  Torres alleges that Frances Shavers and Phillip Johnson were generally involved in the planning of security; she need not also allege, as the Notre Dame Defendants suggest, that they made any decision with respect to her arrest, or that they were even aware of it.

24

Torres also alleges that her arrest was the result of an official policy intended to discriminate against pro-life demonstrators. The Notre Dame Defendants contend that this is the sort of conclusory allegation that cannot stand following *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Unlike *Iqbal*, Plaintiff's complaint provides much more than a formulaic recitation of the elements of a constitutional discrimination claim. In the absence of discovery, it is difficult to imagine what more could be expected of Plaintiff.

<u>State Law Claims</u>

The Notre Dame Defendants argue that this Court should relinquish jurisdiction over Torres' state law claims following the dismissal of her federal claims. While this may be the general rule, this Court has declined to dismiss Torres' federal claims at this juncture, and it is therefore inapplicable here.

Defendants also argue that Torres' claims pursuant to the Indiana Constitution must be dismissed because it does not provide for a private right of action. "No Indiana court has explicitly recognized a private right of action for damages under the Indiana Constitution," *see Thomas v. Brinker*, 2011 WL 1157622 *8 (S.D. Ind. 2011), and the Indiana Supreme Court has stated that "[i]f state tort law is generally available, even if restricted by the ITCA, it is unnecessary to find a state

constitutional tort." *Cantrell v. Morris*, 849 N.E.2d 488, 506 (Ind. 2006). This argument was not well developed by Notre Dame Defendants. Plaintiff responds by indicating that she is not seeking monetary damages under the Indiana Constitution, but instead seeks only declaratory and injunctive relief. The Notre Dame Defendants have cited no authority that shows that Plaintiff is precluded from pursuing declaratory or injunctive relief under the Indiana Constitution. It is not the Court's responsibility to research and construct the parties' arguments. *Donnelly v. Chicago Park Dist.*, 417 F.Supp.2d 992, 994 (N.D. Ill. 2006) (citing *United States v. McClee*, 436 F.3d 751 (7th Cir. 2006)). Accordingly, this Court declines to dismiss Plaintiff's claims pursuant to the Indiana Constitution at this time.

Lastly, the Notre Dame Defendants argue that Plaintiff's remaining claims under Indiana Law should be dismissed because "no Notre Dame Officer arrested, detained, or prosecuted Torres." This Court disagrees that such a conclusion can be made from the allegations in the amended complaint. This argument too is more appropriately addressed at a later stage of the proceedings.

CONCLUSION

For the reasons set forth above, the Notre Dame Defendants' Motion to Dismiss is **DENIED.**


DATED: March 23, 2012                    /s/RUDY LOZANO, Judge
                                         United States District Court